## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
(Tampa Division)

Case No.: _____

**CHRISTIAN ZIEGLER &**
**BRIDGET ZIEGLER,**

      Plaintiffs,

v.

**CITY OF SARASOTA,**
**ANGELA COX, &**
**MARIA LLOVIO,**

      Defendants.

_____/

## COMPLAINT

Plaintiffs Christian Ziegler and Bridget Ziegler hereby sue the City of Sarasota, Detective Angela Cox and Detective Maria Llovio and states as follows:

### PARTIES

1.    Plaintiff Christian Ziegler is a resident and citizen of Florida, and is currently domiciled in Sarasota County, Florida.

2.    Plaintiff Bridget Ziegler is a resident and citizen of Florida, and is currently domiciled in Sarasota County, Florida. Mrs. Ziegler is the wife of Plaintiff Chrisitan Ziegler. Bridget has standing to bring this lawsuit because she has a right to privacy in the marital communications that were seized and publicized by the Sarasota Police Department ("SPD").

3.    The City of Sarasota (the "City") was and is a public municipality organized and existing under and by virtue of the laws of the state of Florida and located in Sarasota County, Florida.  The City operates and controls the SPD. The City and SPD are not distinct entities.

4.    Detective Cox is a Detective with the SPD and, at all material times, was a resident of Sarasota County, Florida. She is being sued in her individual capacity.

5.    Detective Llovio is a Detective with the SPD and, at all material times, was a resident of Sarasota County, Florida. She is being sued in her individual capacity.

## JURISDICTION & VENUE

6.    This is an action brought under 42 U.S.C. § 1983.

7.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

8.    The Tampa Division of the Middle District of Florida is the appropriate venue under 28 U.S.C. § 1391 because all parties reside in Sarasota County, which is assigned to the Tampa Division of the Middle District of Florida.  All events occurred within Sarasota County.

## COLOR OF STATE LAW

9.    As a public municipality organized and operating under the laws of the State of Florida, the City and its agents, including Detective Cox and Detective Llovio, were, and are, acting under the color of state law and authority at all material times.

## BACKGROUND

10.    Plaintiffs Christian Ziegler and Bridget Ziegler hereby file this civil rights action against the City of Sarasota and its detectives, Angela Cox and Maria Llovio, for deliberate and egregious violations of their constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. In a profound abuse of official power and clear instance of investigative misconduct, the Defendants withheld critical exculpatory evidence from judicial review, obtained and executed excessively overbroad search warrants that invaded Mr. Ziegler's private digital records, and intentionally included deeply personal marital communications in public police reports—conduct that systematically dismantled the Zieglers' protections against unreasonable searches, seizures, and deprivations of privacy and due process, while inflicting severe and enduring harm on their family, professional lives, and reputations. Plaintiffs seek complete redress for these unconstitutional abuses, including compensatory and punitive damages, to ensure accountability and prevent future violations of citizens' fundamental rights.

11.    Mr. Ziegler has been a prominent Republican figure in the Sarasota community for almost a decade. He was elected Republican Party State Committeeman representing Sarasota County in 2012, 2016, and 2020. In 2018, he was elected to the Sarasota County Commission where he served as a County Commissioner until 2022. In 2019, he assumed the office of Vice Chairman of the Florida Republican Party, a position he held until 2023. In February 2023, he was elected Chairman of the Republican Part of Florida.

3

12.     Bridget Ziegler, Christian's wife, is also a prominent Republican figure in the Sarasota community. Mrs. Ziegler has served on the Sarasota County School Board since 2014. She currently serves on the Board of Supervisors for the Central Florida Tourism Oversight District. Bridget is also a co-founder of the organization Moms for Liberty.

13.     Due to their status as prominent conservative figures, both Christian and Bridget are often the victims of harassment by liberal activists.

## The SPD Investigates Mr. Ziegler

14.     On or around October 4, 2023, a woman contacted and filed a report with the SPD, claiming that Mr. Ziegler assaulted her in her home on October 2, 2023. SPD was first made aware of the potential allegations when a friend of the alleged victim contacted Detective Llovio.  The alleged victim did not want to come forward or press charges.  Nevertheless, Detective Llovio pressured her into doing so.

15.     In response to the report, SPD immediately opened a criminal investigation into the allegations against Mr. Ziegler. SPD assigned Detective Cox as the lead investigator with Detective Llovio and Detective Sergeant Riffe assisting with the investigation. As the lead investigator, Detective Cox exclusively controlled the direction of the investigation and decided how SPD conducted its investigation into Mr. Ziegler.

16.     On October 25, 2023, Detectives Cox and Llovio interviewed Mr. Ziegler's accuser at her home. While meeting with the accuser, Detectives Cox and Llovio received permission to search the accuser's cell phone and perform a digital

extraction of the cell phone's contents. Upon review of the cell phone's contents, SPD learned of Mrs. Ziegler's possible involvement in the allegations.

17.    On October 27, 2023, Detectives Cox and Llovio met with the accuser and conducted a series of recorded messages and phone calls with Mr. Ziegler. By conducting the controlled phone calls and text messages Detectives Cox and Llovio were "hoping to trick" Mr. Ziegler into confessing to the crime he was accused of.

18.    Following up on their lead from the accuser's phone, on November 1, 2023, Detective Llovio and another SPD officer briefly met with Mrs. Ziegler at her office to discuss her potential involvement with the allegations against Mr. Ziegler. After talking with Mrs. Ziegler, Detectives Cox and Llovio came to the conclusion that Mrs. Ziegler was not directly involved with the allegations and did not seek any further information from her.

19.    That same day, Detective Cox and Seargent Riffe met with Mr. Ziegler to ask him questions. During the interview, Mr. Ziegler stated that he did not want to speak to SPD without an attorney. He immediately ended the meeting and hired local attorney Derek Byrd.

20.    At around Noon on November 1, Mr. Ziegler met with Attorney Byrd. Mr. Ziegler was in possession of a video that completely exonerated him.

21.    About an hour and a half later, Attorney Byrd contacted Seargent Riffe to inform him that Mr. Ziegler was in possession of a video that exonerated him. Seargent Riffe and Mr. Byrd agreed to meet at Mr. Byrd's office the following morning to view the video.

22.     After speaking with Mr. Byrd, at around 6pm that evening, Seargent Riffe held a meeting with Detectives Cox and Llovio and informed both Detectives that Mr. Ziegler possessed an exculpatory video and that they would be meeting with Mr. Byrd and Mr. Ziegler the next morning to view the video.

23.     Later that night, and after they were informed of the existence of an exculpatory video, Detectives Cox and Llovio together prepared a search warrant for Mr. Ziegler's entire cell phone. The search warrant broadly sought:

1. All data regarding the target device identity information including the assigned phone number, serial number, make, model, IMEI, carrier, and owner information.
2. All data regarding text communication including SMS, MMS, and 3rd party application communication whether incoming, outgoing, and drafts including any associated metadata.
3. All data regarding contacts including any associated logs and metadata.
4. All data regarding call log history, including incoming, outgoing, missed, and dialed any associated metadata.
5. All data regarding images, videos, and audio files, including any associated metadata.
6. All data regarding web history, including web sites visited[,] internet searches, web bookmarks, internet cookies, download data, and any associated metadata.
7. All data regarding emails whether incoming, outgoing and drafts and associated metadata.
8. All data regarding GPS locations, location information, longitude and latitude data, cell tower locations, Wi-Fi connections, Bluetooth connections, hot spot connections, including any associated metadata.
9. All data regarding documents, installed applications, autofill data, user accounts, passwords, PINS, notes pattern locks, financial transaction records, credit card numbers, including any associated metadata.

Notably, the warrant did not contain any sort of temporal limitation and—without exaggeration—sought all data stored on Mr. Ziegler's cell phone, regardless of its potential relevance to SPD's investigation.

24.     The warrant was supported by an affidavit drafted by Detective Cox and Detective Llovio which summarized the evidence SPD had obtained to that point including a detailed description of the alleged sexual assault, summary of controlled calls and messages between Mr. Ziegler and the accuser, and a summary of SPD's interview with Mrs. Ziegler. Detective Cox signed the affidavit in support; Detective Llovio notarized the affidavit and was aware of its contents. Importantly, the affidavit omitted any reference to Sergeant Riffe's conversation with Mr. Byrd and the exonerating video Mr. Ziegler possessed. Equally egregious, the affidavit failed to mention that Detectives Cox and Llovio would be meeting with Mr. Ziegler to view the exculpatory video the following morning.

25.     At around 9:30pm, Detective Cox sent the proposed warrant to the State Attorney's Office for approval. In her email, Detective Cox failed to mention the existence of the exculpatory video. At around 10:30pm, the State Attorney's Office approved the proposed warrant, and it was sent to Judge Thomas Krug for signature. Judge Krug signed the warrant shortly before midnight on November 1.

26.     Detective Llovio would later testify that neither she nor Detective Cox thought it was important to go back to Judge Krug and advise him of the exculpatory video on Mr. Ziegler's phone. She further testified that it was not normal practice or

7

policy of the SPD to return to a judge and advise him of any exculpatory evidence discovered prior to execution of a search warrant.

27.     On November 2, 2023, at around 8:15am, Detectives Cox and Llovio and Seargent Riffe met with Mr. Ziegler and Attorney Byrd at Byrd's office to continue their interview of Mr. Ziegler and to view the exculpatory video.

28.     During the course of the conversation, Detective Llovio asked Mr. Ziegler to show them the video. Mr. Ziegler then played the video for the officers on his cell phone. The exculpatory nature of the video was immediately apparent to everyone who viewed the video. All SPD officers who were present at Attorney Byrd's office later testified that upon viewing the video, they immediately knew it exonerated Mr. Ziegler of the accusations against him.

29.     Mr. Ziegler offered to provide the video to the SPD officers, but the officers refused. Apparently, there were concerns about verifying the date of the video. SPD presented him with the overly broad warrant for the *entirety* of Mr. Ziegler's cell phone, not just the video.

30.     Even assuming the search warrant was lawful when it was signed by the judge, the facts on the ground so fundamentally changed and undermined the warrant that executing it constituted a due process violation.

31.     Detectives Cox and Llovio and Sergeant Riffe then seized Mr. Ziegler's cell phone pursuant to the search warrant. At the time of the seizure, the Detectives advised Mr. Ziegler and Mr. Byrd that they were forced to download the entire contents of Mr. Ziegler's cell phone, including personal photos and videos and data

8

completely unrelated to SPD's investigation. However, the Detectives stated that they would limit their search to the video and a specific message the accuser sent Mr. Ziegler.

32.    At the time of the seizure, Mr. Ziegler advised SPD that he had private communications with his wife on the phone. SPD responded by telling him they would only be looking for the video, communications with the accuser and would otherwise be limited to the time of the alleged incident, etc.

33.    SPD's download of Mr. Ziegler's cell phone took *five days* to complete. SPD downloaded Mr. Ziegler's entire internet search history, 30,417 videos, 473,199 photos, and roughly 1,200 text messages.

34.    Despite stating they would limit their search to just the video and a specific message between Mr. Ziegler and his accuser, Detective Cox and Detective Llovio rummaged through all of the Electronically Stored Information (ESI) that was downloaded from Mr. Ziegler's cell phone. The Detectives' review of the downloaded material expanded to videos, photographs, and messages created years before the alleged conduct involving Mr. Ziegler's accuser. Of course, none of this material was identified in the warrant that Judge Krug signed off on. Detectives Llovio and Cox then flagged any pictures or videos they thought were relevant and put them in a separate folder to review. Detectives Cox and Llovio testified they flagged and transferred completely unrelated personal pictures and texts that were created years before the date of the alleged incident.

35.    Detectives Cox and Llovio would later state that SPD has no policy requiring a "taint team," or a group of individuals who are responsible for ensuring no confidential or sensitive information is reviewed by the SPD during the process of extracting ESI from a cell phone.  All communications were accessed and reviewed by law enforcement – things entirely irrelevant to the investigation and privileged communications between Mr. Ziegler and his spouse and his attorney.  The failure to have and use a taint team to prevent the disclosure and search of privileged communications violates the Fourth, Fifth, and Fourteenth Amendments.

36.    After reviewing the seized ESI, Detectives Cox and Llovio were unable to locate the exculpatory video. On November 13, 2023, Detective Cox and Llovio prepared a warrant directed to Google for Mr. Ziegler's Google Drive account with the intention of finding the exculpatory video. Detective Cox signed the supporting affidavit; Detective Llovio notarized it and was aware of the contents. Despite Mr. Ziegler's prior offer to surrender the video, neither Detective Cox nor Detective Llovio contacted Mr. Ziegler for a copy of the video. Instead, the Detectives intentionally chose to continue their baseless and illegal search into Mr. Ziegler's personal life.

37.    Like the warrant for Mr. Ziegler's cell phone, the Google warrant was overly broad. Despite only needing the warrant to locate a single video stored on Mr. Ziegler's Google Drive, the warrant sought:

> 1. Stored electronic communications or files associated with user accounts identified as Google User ID: [redacted]@gmail.com and any related accounts concerning the same account subscribers or users, since creation of such account until the date of production[;]

10

2. Records concerning the identity of the user of the above-listed user account(s); consisting of name, postal code, country, e-mail address, date of the account creation, IP address at account sign-up, logs showing IP address at account sign-up, logs showing IP address, and date stamps for account accesses

3. Any photo prints linked to or associated with the above-listed user account(s). The photo prints are to include a compilation of all photos and or videos uploaded by the user that have not been deleted, along with all photos and videos uploaded by any user that has the user tagged in them

4. Any additional video and/or images uploaded or downloaded to the account with any associated metadata, timestamps, and IP addresses associated with the upload or download, as well as transactional logs that show user interaction with the videos/images

5. Stored Android backups,

6. Stored web bookmarks, web history, and autofill data that are stored under this account,

7. Files stored in the Google Drive related to this accident, to include shared folders that are accessible by this account,

8. Files stored in the Google Drive related to this account, to include shared folders that are accessible by this account with any associated metadata (EXIF), timestamps, IP addresses associated with the upload or download, any transactional logs that show user interaction with the videos/images;

9. Google Hangouts conversation content and history associated to this account,

10. Any additional Google Account or Google Play account, to include, account information, and account history,

11. Any location history including global positioning coordinates,

12. Google wallet/checkout service information, and

13. Installed application, device make(s), model(s) and international mobile identification number (IMEI) or mobile equipment identifier number (MEID) for Google account[.]

Again, the Google warrant did not include any sort of temporal limitation. Essentially,

Detectives Cox and Llovio were seeking unfettered access to rummage through Mr.

Ziegler's Google Drive.

38.     Like the affidavit supporting the search warrant for Mr. Ziegler's cell phone, the affidavit prepared by Detectives Cox and Llovio was deficient. Again, Detectives Cox and Llovio failed to mention the existence of the exculpatory video. The affidavit was grossly misleading, as the affidavit failed to mention that she, Detective Llovio, and Sergeant Riffe previously viewed the video and acknowledged its exculpatory nature. Moreover, the warrant failed to mention why it was necessary to obtain data and information dating back to years before the alleged crime was committed.

39.     In response to the warrant, Google provided all of the requested information. Despite having access to the entirety of Mr. Ziegler's Google Drive, Detectives Cox and Llovio were still unable to locate the exculpatory video.

40.     After downloading and gaining access to Mr. Ziegler's entire life, SPD finally decided to take Mr. Ziegler up on his offer and agreed to meet with him in person to extract the exculpatory video from his computer.

41.     On December 1, 2023, Mr. Ziegler met with SPD at a parking lot and voluntarily provided them with his computer so that SPD could extract the exculpatory video. The SPD officers also took photographs of information from Mr. Ziegler's cell phone to compare with the metadata of the video.

42.     Using the metadata from the extracted video, SPD confirmed that the video was taken the day of October 2, 2023, and ceased investigating Mr. Ziegler for assault.  SPD could have done this on November 2, 2023 before and without violating Mr. Ziegler's constitutional rights, but SPD decided to go in a different direction.

12

43.    Unfortunately, SPD was not done harassing Mr. Ziegler and his family. Upon completing its investigation into the allegations of assault, SPD began investigating Mr. Ziegler for video voyeurism under the theory that he recorded the accuser without her consent.

44.    In furtherance of its investigation into the video voyeurism charge, the SPD drafted a warrant directed to Meta/Instagram which sought:

1. Any and all stored electronic communications or files associated with the user accounts identified as User Accounts Identified by User ID(s):
   [redacted]

   Username: [redacted]

   And any related accounts concerning the same account subscribers or users, since the creation of such account until the present time of this affidavit, including the content and header information of email messages and any attachments, user contact information, group contact information, IP logs, and instant messages (Instagram Messenger) to include vanish mode messages, whether drafted, sent, received, opened or unopened, read or unread, and/or forwarded, and any buddy lists or contact lists, calendars, transactional data, account passwords or identifiers, and/or any other files related to those accounts.

2. Any Neoprints linked to or associated with the above Instagram user account. A Neoprint is an expanded view of a given user profile. It contains their current profile information, and all wall postings and messages to and from the user that have not been deleted by the user.

3. Any Photoprints or videos linked to or associated with the above Instagram user account. A Photoprint is a compilation of all photos uploaded by the user that have not been deleted, along with all photos uploaded by any user that has the user tagged in them.

4. Records concerning the identity of the user of the above-listed user account(s); consisting of name, postal code, country, e-mail address, date of account creation, IP address at account sign-up, logs showing IP address, and date stamps for account accesses.

5. Journal entries, Neoprints, comments, and the contents of private messages in the above-listed user's inbox, sent mail and trash folders related to the above-listed user account(s);

6. Any images, videos, or chats within the vanish mode setting of the above account.

Again, the warrant did not contain any sort of temporal limitation.

45.    Importantly, for the first time, SPD acknowledged that Detectives Cox and Llovio viewed the exculpatory video in Mr. Byrd's office on November 2. Equally notable, the Meta/Instagram warrant was not drafted, executed or notarized by Detective Cox or Detective Llovio, but rather other officers.

46.    Meta/Instagram produced everything requested, but none of it was helpful to SPD's investigation.

47.    On January 19, 2024, SPD referred to the State Attorney's Office a charge of video voyeurism. On March 6, 2024, the State Attorney's Office declined to formally charge Mr. Ziegler. SPD's investigation officially ended without any charges being brought against Mr. Ziegler.

48.    Unfortunately, by that point, the damage had already been done to the Zieglers and their family. In January 2024, Mr. Ziegler was forced to step down from his position as Chair of the Florida Republican Party. Additionally, Mr. Ziegler lost a significant amount of work for his political consulting business. Mrs. Ziegler was forced to resign from her position at the Leadership Institute

49.    As part of SPD's investigation, Detectives Cox and Llovio prepared police reports which contained deeply confidential and personal information from Mr. Ziegler's cell phone that they never should have been able to access in the first place.

14

The Defendants knew that they could not use communication between Mr. and Mrs. Ziegler against them, but they included them in the police reports anyway. It is as if the Defendants intentionally did an end-run around the Constitution and state law in an effort to embarrass and injury Mr. and Mrs. Ziegler. The release of these personal messages and information caused Mr. and Mrs. Ziegler to suffer extreme embarrassment and mental anguish, as they were forced to watch as their personal business was posted in both local, state, and national newspapers and reported on by local, state, national, and international news stations.

50.    Moreover, the Zieglers were forced to file a lawsuit against the City and the State Attorney in Sarasota County to protect their privacy and property rights and to stop the release of the documents and ESI unlawfully seized by the SPD. The lawsuit was successful but is currently on appeal with Florida's Second District Cort of Appeal.  Among the findings by the trial court was the conclusion that the warrants were illegal.  Neither the City nor the State Attorney appealed or contested that legal and factual conclusion.

51.    The state court lawsuit has cost the Zieglers hundreds of thousands of dollars in attorney's fees.

52.    Even though it has been almost two years since Mr. Ziegler was cleared of any alleged criminal activity, Mr. Ziegler's personal business continues to struggle and he has failed to achieve the same levels of business he attained prior to the SPD's investigation. To this day, the Zieglers' reputation has not recovered.

## COUNT I: VIOLATION OF THE FOURTH, FIFTH & FOURTEENTH AMENDMENTS
(Against the City of Sarasota)

53.    The Zieglers reallege and incorporate by reference paragraphs 1–52 as though fully set forth herein.

54.    42 U.S.C. § 1983 states that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory of the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

55.    As alleged herein, the City has an official custom and policy that requires the SPD to download the entirety of a cell phone seized pursuant to a search warrant. This policy grants SPD unfettered access to all private and confidential information stored on the cell phone, including private and confidential information that is entirely unrelated to the purpose of SPD's investigation.  The City's policy of obtaining and executing only broad general warrants is a blatant Fourth Amendment violation.  The City has a policy of taking no steps to limit the scope of a search warrant for a cell phone.

56.    The City has a policy of seizing and searching an entire cell phone without due regard to the cell phone owner's right to maintain the confidentiality of attorney-client privileged or spousal privileged communications. The City does not use a "taint team," or a group of individuals who are responsible for ensuring no

confidential or sensitive information is reviewed by the SPD during the process of extracting ESI from a cell phone. The detectives who were involved in the investigation testified that they were not even aware of what a taint team is or why it matters.

57.    With respect to cell phones, the City has a policy of only obtaining unlawful general warrants of the entire phone. This is not constitutionally permissible and not required.

58.    Because of the City's policy relating to the search procedures for seized cell phones, specifically the City's policy requiring a full download of a seized cell phone, SPD officers were forced to obtain an overly broad search warrant directed towards the entirety of Mr. Ziegler's cell phone.

59.    Pursuant to that overly broad search warrant, SPD Detectives gained access to hundreds of thousand deeply personal and confidential pictures, videos, and text messages belonging to Mr. Ziegler, most of which were unrelated to its investigation. Messages seized by the SPD included marital communications sent between the Zieglers; Mrs. Ziegler possesses a privacy right in those messages.

60.    Moreover, SPD would not have been able to gain access to the deeply personal and confidential information if they had employed the use of a taint team.

61.    The City's policies, policies and customs violated Mr. Ziegler's fourth, fifth and fourteenth amendment rights. Based on the testimony of Detectives Riffe, Llovio and Cox, this is no mere anomaly – but standard practice by SPD.

62.     The City's policies, policies and customs violated Mrs. Ziegler's fourth and fourteenth amendment rights.  Based on the testimony of Detectives Riffe, Llovio and Cox, this is no mere anomaly – but standard practice by SPD.

63.     The Zieglers suffered injuries, damages, and losses proximately caused by the policies and practices of the City as alleged herein.

64.     As a legal and proximate result of the policies and practices of the City as alleged herein, the Zieglers have sustained general damages consisting of pain, suffering, anxiety, and other physical and emotional damages in such sums as shall be determined.

65.     As a further legal and proximate result of the policies and practices of the City as alleged herein, the Zieglers have sustained economic damages consisting of loss of past and future earnings, and other career development opportunities, in such nature and sums as shall be determined.

66.     Pursuant to 42 U.S.C. § 1988, and other applicable law, the Zieglers are entitled to an award of costs and expenses incurred in bringing this action, including his reasonable attorney's fees.

## COUNT II: VIOLATION OF THE FOURTH, FIFTH & FOURTEENTH AMENDMENTS
(Against Detective Cox)

67.     The Zieglers reallege and incorporate by reference Paragraphs 1–52 as though fully set forth herein.

68.    Detective Cox knew that the affidavit for the Search Warrant for Mr. Ziegler's cell phone contained false and misleading information at the time the affidavit was submitted to Judge Krug.  She knew it omitted material information.

69.    Detective Cox knew that the affidavit for the Search Warrant for Mr. Ziegler's Google Drive account contained false and misleading information at the time the affidavit was submitted to Judge Krug.  She knew it omitted material information.

70.    Detective Cox intended Judge Krug to rely on the false and misleading information in the affidavit for the cell phone search warrant.

71.    Detective Cox intended to make Judge Krug rely on the false and misleading information in the affidavit for the Google search warrant.

72.    Detective Cox knew that the search warrant for Mr. Ziegler's cell phone she prepared was based on false and misleading information in the Affidavit and was overbroad on its face.

73.    Detective Cox knew that the search warrant for Mr. Ziegler's Google Drive account was based on false and misleading information in the Affidavit and was overbroad on its face.

74.    The affidavit supporting the search warrant for Mr. Ziegler's cell phone and the warrant itself are overbroad on their face and cannot serve as the basis for a lawful search or seizure of Mr. Ziegler's cell phone.

75.    The affidavit supporting the search warrant for Mr. Ziegler's Google drive account and the warrant itself are overbroad on their face and cannot serve as the basis for a lawful search or seizure of Mr. Ziegler's Google Drive account.

76.    Detective Cox improperly used both illegal search warrants as justification to search and gain access to Mr. Ziegler's private and personal ESI, including marital communications from Mrs. Ziegler.

77.    Detective Cox's actions violated Mr. Ziegler's clearly establish Fourth Amendment right to be free from illegal searches and seizures.

78.    Detective Cox's actions violated Mrs. Ziegler's clearly established Fourth Amendment right to privacy.

79.    Detective Cox executed the cell phone warrants despite a material change in circumstances that entirely undermined the warrant and supporting affidavit – to wit, her review of an entirely exculpatory video.

80.    Detective Cox knowingly obtained two unlawful general warrants.

81.    Upon information and belief, Detective Cox was motivated by actual malice toward the Zieglers.

82.    As a direct and proximate cause of Detective Cox's actions in violation of the Fourth, Fifth and Fourteen Amendments, the Zieglers have suffered both economic and non-economic damages.

83.    Pursuant to 42 U.S.C. § 1988, and other applicable law, the Zieglers are entitled to an award of costs and expenses incurred in bringing this action, including his reasonable attorney's fees.

## COUNT III: VIOLATION OF THE FOURTH, FIFTH & FOURTEENTH AMENDMENTS
(Against Detective Llovio)

84.    The Zieglers reallege and incorporate by reference Paragraphs 1–52 as though fully set forth herein.

85.    Detective Llovio knew that the affidavit for the Search Warrant for Mr. Ziegler's cell phone contained false and misleading information at the time the affidavit was submitted to Judge Krug.  She knew it omitted material information.

86.    Detective Llovio knew that the affidavit for the Search Warrant for Mr. Ziegler's Google Drive account contained false and misleading information at the time the affidavit was submitted to Judge Krug.  She knew it omitted material information.

87.    Detective Llovio intended Judge Krug to rely on false and misleading information in the affidavit for the cell phone search warrant.

88.    Detective Llovio intended Judge Krug to rely on the false and misleading information in the affidavit for the Google search warrant.

89.    Detective Llovio knew that the search warrant for Mr. Ziegler's cell phone she prepared was based on false and misleading information in the affidavit and was overbroad on its face.

90.    Detective Llovio knew that the search warrant for Mr. Ziegler's Google Drive account was based on false and misleading information in the affidavit and was overbroad on its face.

91.    The affidavit supporting the search warrant for Mr. Ziegler's cell phone and the warrant itself are overbroad on their face and cannot serve as the basis for a lawful search or seizure of Mr. Ziegler's cell phone.

92.    The affidavit supporting the search warrant for Mr. Ziegler's Google drive account and the warrant itself are overbroad on their face and cannot serve as the basis for a lawful search or seizure of Mr. Ziegler's Google Drive account.

93.    Detective Llovio improperly used both illegal search warrants as justification to search Mr. Ziegler's private and personal ESI, including marital communications sent by Mrs. Ziegler.

94.    Detective Llovio's actions violated Mr. Ziegler's clearly established Fourth Amendment right to be free from illegal searches and seizures.

95.    Detective Llovio's actions violated Mrs. Ziegler's clearly established Fourth Amendment right to privacy.

96.    Detective Llovio executed the cell phone warrants despite a material change in circumstances that entirely undermined the warrant and supporting affidavit – to wit, her review of an entirely exculpatory video.

97.    Detective Llovio knowingly obtained two unlawful general warrants.

98.    Upon information and belief, Detective Llovio was motivated by actual malice toward the Zieglers

99.    As a direct and proximate cause of Detective Llovio's actions in violation of the Fourth, Fifth and Fourteen Amendments, the Zieglers have suffered both economic and non-economic damages.

100.   Pursuant to 42 U.S.C. § 1988, and other applicable law, the Zieglers are

entitled to an award of costs and expenses incurred in bringing this action, including

reasonable attorney fees.

## **JURY TRIAL DEMAND**

101.   The Zieglers demand a jury trial on all counts so triable.

//

//

## **PRAYER FOR RELIEF**

The Zieglers pray this Court:

i.      Enters judgment in their favor and against Defendants the City of Sarasota, Angela Cox, and Maria Llovio;

ii.     Awards compensatory damages including, but not limited to, lost wages and attorney fees for suing to prevent the release of improperly seized personal property, against Defendants;

iii.    Awards non-economic for the Zieglers mental anguish, pain and suffering, and humiliation and embarrassment;

iv.     Awards punitive damages against Cox and Llovio;

v.      Awards the Zieglers their reasonable attorney's fees pursuant to sections 42 U.S.C. § 1988;

vi.     Awards taxable costs; and

vii.    Awards any further relief the Court deems necessary and appropriate.

Respectfully submitted,

Matthew Seth Sarelson
Florida Bar 888281
Zachary Stoner
Florida Bar 1032816
**DHILLON LAW GROUP, INC.**
Attorneys for Plaintiffs
1601 Forum Place, Suite 202
West Palm Beach, Florida 33401
305.391.2111

msarelson@dhillonlaw.com
zstoner@dhillonlaw.com