**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
(Tampa Division)
Case No.: 8:25-cv-02992-CEH-AAS

**CHRISTIAN ZIEGLER &**
**BRIDGET ZIEGLER,**

Plaintiffs,

v.

**CITY OF SARASOTA, ANGELA COX,**
**MARIA LLOVIO, & ED BRODSKY,**
**in his official capacity as State Attorney**
**for Florida's Twelfth Judicial Circuit,**

Defendants.
___________________________________/

## AMENDED COMPLAINT

Plaintiff Christian Ziegler and Bridget Ziegler hereby sue the City of Sarasota, Detective Angela Cox, Detective Maria Llovio, and Ed Brodsky, solely in his official capacity as State Attorney for Florida's Twelfth Judicial Circuit, for multiple and ongoing constitutional violations redressable via 42 U.S.C. § 1983 and other applicable federal law.

//

**PARTIES**

1. Plaintiff Christian Ziegler is a citizen of Florida and is domiciled in Sarasota County, Florida.

2. Plaintiff Bridget Ziegler is a citizen of Florida and is domiciled in Sarasota County, Florida.

3. The City of Sarasota (the "City") was and is a public municipality organized and existing under and by virtue of the laws of the state of Florida and located in Sarasota County, Florida. The City operates and controls the SPD. The City and SPD are not distinct entities.

4. Detective Cox is a Detective with the SPD and, at all material times, was a resident of Sarasota County, Florida. She is being sued in her individual capacity.

5. Detective Llovio is a Detective with the SPD and, at all material times, was a resident of Sarasota County, Florida. She is being sued in her individual capacity.

6. Ed Brodsky (the "State Attorney") is the State Attorney for Florida's Twelfth Judicial Circuit serving Sarasota County, Florida. He is

sued in his official capacity only and only for injunctive relief. He is a state official.

## JURISDICTION & VENUE

7. This is an action brought pursuant to 42 U.S.C. § 1983 and the Fifth Amendment of the United States Constitution.

8. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because all claims arise under federal law.

9. The Tampa Division of the Middle District of Florida is the appropriate venue under 28 U.S.C. § 1391 because all parties reside in Sarasota County, which is assigned to the Tampa Division of the Middle District of Florida. All events occurred within Sarasota County.

## COLOR OF STATE LAW

10. As a public municipality organized and operating under the laws of the State of Florida, the City and its agents, including Detective Cox and Detective Llovio, were, and are, acting under the color of state law and authority at all material times. Ed Brodsky is a state official and was and is always acting under color of state law.

**BACKGROUND**

11. Plaintiff Christian Ziegler hereby files this civil rights action against the City of Sarasota and its detectives, Angela Cox and Maria Llovio, and the State Attorney, for deliberate and egregious violations of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendment to the United States Constitution. In a profound abuse of official power and clear instance of investigative misconduct, Defendants Cox and Llovio withheld critical exculpatory evidence from judicial review, obtained and executed excessively overbroad search warrants that invaded Mr. Ziegler's private digital records, and intentionally included deeply personal marital communications in public police reports—conduct that systematically dismantled Mr. Ziegler's protections against unreasonable searches, seizures, and deprivations of privacy and due process, while inflicting severe and enduring harm on his family, professional life, and reputation. Plaintiff seeks complete redress for these unconstitutional abuses, including compensatory and punitive damages, to ensure accountability and prevent future violations of citizens' fundamental rights.

12. Mr. Ziegler has been a prominent Republican figure in the Sarasota community for over a decade. He was elected Republican Party State Committeeman representing Sarasota County in 2012, 2016, and 2020. In 2018, he was elected to the Sarasota County Commission where he served as a County Commissioner until 2022. In 2019, he assumed the office of Vice Chairman of the Florida Republican Party, a position he held until 2023. In February 2023, he was elected Chairman of the Republican Party of Florida. At all material times relevant to his lawsuit, Ziegler was a private citizen.

13. Christian's wife, Plaintiff Bridget Ziegler, is also a prominent Republican figure in the Sarasota community. Mrs. Ziegler has served on the Sarasota County School Board since 2014. She currently serves on the Board of Supervisors for the Central Florida Tourism Oversight District. Bridget is also a co-founder of the organization Moms for Liberty.

14. Due to their status as prominent conservative figures, both Christian and Bridget are often the victims of harassment by liberal activists. In this case, it appears both were targeted for political reasons.

//

**The SPD Investigates Mr. Ziegler**

15. On or around October 4, 2023, a woman contacted SPD on behalf of her coworker ("Ms. Doe"), claiming Ms. Doe was assaulted by Mr. Ziegler in Ms. Doe's home on October 2, 2023. Ms. Doe did not want to come forward or press charges. According to an individual close with Ms. Doe, she never personally reached out to SPD, nor did she consent to her coworker contacting SPD.

16. In response to the report, SPD sent four male officers to Ms. Doe's home to administer a rape kit and discuss filing charges against Mr. Ziegler. However, Ms. Doe declined to press charges because she could not remember her encounter with Mr. Ziegler.

17. Later, the SPD would send a second set of officers to Ms. Doe's house to discuss pressing charges against Mr. Ziegler, but Ms. Doe again declined for the same reasons as before.

18. Finally, SPD sent Detectives Llovio and Cox to Ms. Doe's house to persuade her to press charges against Mr. Ziegler. Importantly, Detective

Llovio has a personal history with Ms. Doe, as the two were neighbors and lived in the same community at one point.

19. Detective Llovio used her existing relationship with Ms. Doe to influence Ms. Doe's decision making. Detective Llovio would consistently call and text Ms. Doe with the intent of trying to convince her to press charges against Mr. Ziegler. At one point, Detective Llovio told Ms. Doe that Mr. Ziegler is a "bad guy" and that she needed to press charges against him "or else he will do this again." Upon information and belief, Detective Llovio is politically opposed to Mr. and Mrs. Zeigler and object to their conservative views and policies.

20. As a direct result of Detective Llovio's pressure, Ms. Doe agreed to move forward against Mr. Ziegler and SPD opened a criminal investigation into the allegations against Mr. Ziegler. SPD assigned Detective Cox as the lead investigator with Detective Llovio and Detective Sergeant Riffe assisting with the investigation. Though Detective Cox was named lead investigator, she collaborated with and relied on Detective

Llovio's input throughout the entire investigation. The two detectives would draft affidavits for warrants and conduct witness interviews together.

21. Ms. Doe would later confide to a friend she made a mistake by filing a report against Mr. Ziegler. Ms. Doe felt the SPD feigned its interest in protecting her and manipulated her into pressing charges against Mr. Ziegler. More specifically, Detective Llovio, motivated by her personal animosity against Mr. and Mrs. Ziegler, abused her close relationship with Ms. Doe and used it to damage Mr. Ziegler.

22. On October 25, 2023, Detectives Cox and Llovio interviewed Mr. Ziegler's accuser at her home. While meeting with the accuser, Detectives Cox and Llovio received permission to search the accuser's cell phone and perform a digital extraction of the cell phone's contents. Upon review of the cell phone's contents, SPD learned of Mrs. Ziegler's possible involvement in the allegations.

23. On October 27, 2023, Detectives Cox and Llovio met with the accuser and conducted a series of recorded messages and phone calls with Mr. Ziegler. By conducting the controlled phone calls and text messages

Detectives Cox and Llovio were "hoping to trick" Mr. Ziegler into confessing to the crime he was accused of.

24. Following up on their lead from the accuser's phone, on November 1, 2023, Detective Llovio and another SPD officer briefly met with Mrs. Ziegler at her office to discuss her potential involvement with the allegations against Mr. Ziegler. After talking with Mrs. Ziegler, Detectives Cox and Llovio came to the conclusion that Mrs. Ziegler was not directly involved with the allegations and did not seek any further information from her. She was never accused of or investigated for any crime.

25. That same day, Detective Cox and Seargent Riffe met with Mr. Ziegler to ask him questions. During the interview, Mr. Ziegler stated that he did not want to speak to SPD without an attorney. He immediately ended the meeting and hired local attorney Derek Byrd.

26. At around noon on November 1, Mr. Ziegler met with Attorney Byrd. Mr. Ziegler was in possession of a video that completely exonerated him.

27. About an hour and a half later, Attorney Byrd contacted Seargent Riffe to inform him that Mr. Ziegler was in possession of a video that exonerated him. Seargent Riffe and Mr. Byrd agreed to meet at Mr. Byrd's office the following morning to view the video.

28. After speaking with Mr. Byrd, at around 6pm that evening, Seargent Riffe held a meeting with Detectives Cox and Llovio and informed both Detectives that Mr. Ziegler possessed an exculpatory video and that they would be meeting with Mr. Byrd and Mr. Ziegler the next morning to view the video.

29. Later that night, and after they were informed of the existence of an exculpatory video, Detectives Cox and Llovio together hastily prepared a search warrant for Mr. Ziegler's entire cell phone. The search warrant broadly sought:

1. All data regarding the target device identity information including the assigned phone number, serial number, make, model, IMEI, carrier, and owner information.
2. All data regarding text communication including SMS, MMS, and 3rd party application communication whether incoming, outgoing, and drafts including any associated metadata.

3. All data regarding contacts including any associated logs and metadata.
4. All data regarding call log history, including incoming, outgoing, missed, and dialed any associated metadata.
5. All data regarding images, videos, and audio files, including any associated metadata.
6. All data regarding web history, including web sites visited[,] internet searches, web bookmarks, internet cookies, download data, and any associated metadata.
7. All data regarding emails whether incoming, outgoing and drafts and associated metadata.
8. All data regarding GPS locations, location information, longitude and latitude data, cell tower locations, Wi-Fi connections, Bluetooth connections, hot spot connections, including any associated metadata.
9. All data regarding documents, installed applications, autofill data, user accounts, passwords, PINS, notes pattern locks, financial transaction records, credit card numbers, including any associated metadata.

Notably, the warrant did not contain any sort of temporal limitation and—without exaggeration—sought to seize all data stored on Mr. Ziegler's cell phone, regardless of its potential relevance to SPD's investigation. *See* Exhibit A (cell phone warrant).

30. But it gets worse. The search *and* the seizure were for the entire contents of the phone without any limitation whatsoever. The Defendants know this is unlawful. Footnote 2 (there is no footnote 1) of the search

warrant states: "While the search warrant being sought does not contain a time period or date restriction, it does contain a subject-matter limitation, which also satisfies the 4th Amendment particularity requirement." This is a lie – there is no subject-matter limitation in the application or the warrant. The Defendants know there is a particularity requirement under the Fourth Amendment – but they're acknowledging they are violating it. The warrant appears to be a form document, and thus it appears that every cell phone search warrant obtained by the City is unlawful.

31. The warrant was supported by an affidavit drafted by Detective Cox and Detective Llovio which summarized the evidence SPD had obtained to that point including a detailed description of the alleged sexual assault, summary of controlled calls and messages between Mr. Ziegler and the accuser, and a summary of SPD's interview with Mrs. Ziegler. Detective Cox signed the affidavit in support; Detective Llovio notarized the affidavit and was aware of its contents. Upon information and belief, Detective Llovio assisted with the drafting of the search warrant in addition to notarizing it.

32. Importantly, the affidavit omitted any reference to Sergeant Riffe's conversation with Mr. Byrd and the exonerating video Mr. Ziegler possessed. Equally egregious, the affidavit failed to mention that Detectives Cox and Llovio would be meeting with Mr. Ziegler to view the exculpatory video the following morning. They knew of the video prior to seeking the warrant. While drafting the search warrant, both Detectives Cox and Llovio apparently—and probably—intentionally agreed to omit any reference to the exculpatory video prior to submitting the warrant for judicial approval. The existence of the exculpatory video precluded any basis for probable cause and completely undermined any investigation.

33. At around 9:30pm, Detective Cox sent the proposed warrant to the State Attorney's Office for approval. In her email, Detective Cox failed to mention the existence of the exculpatory video. At around 10:30pm, the State Attorney's Office approved the proposed warrant, and it was sent to Judge Thomas Krug for signature. Judge Krug signed the warrant shortly before midnight on November 1.

34. The timing on this is relevant. The Detectives rushed to get a search warrant for the phone only after learning of the existence of exculpatory evidence.

35. Detective Llovio would later testify that neither she nor Detective Cox thought it was important to go back to Judge Krug and advise him of the exculpatory video on Mr. Ziegler's phone. She further testified that it was not normal practice or policy of the SPD to return to a judge and advise him of any exculpatory evidence discovered prior to execution of a search warrant.

36. On November 2, 2023, at around 8:15am, Detectives Cox and Llovio and Seargent Riffe met with Mr. Ziegler and Attorney Byrd at Byrd's office to continue their interview of Mr. Ziegler and to view the exculpatory video.

37. During the course of the conversation, Detective Llovio asked Mr. Ziegler to show them the video. Mr. Ziegler then played the video for the officers on his cell phone. The exculpatory nature of the video was *immediately* apparent to everyone who viewed the video. All SPD officers

who were present at Attorney Byrd's office later testified that upon viewing the video, they immediately knew it exonerated Mr. Ziegler of the accusations against him. Despite a material change in the facts, *i.e.*, the affidavit in support of the search warrant was no longer accurate and omitted material facts known to the officers that fundamentally undermined the warrant, the officers did not stop the execution of the warrant and did not advise the judge.

38. Mr. Ziegler offered to provide the exculpatory video to the SPD officers, but the officers refused. Apparently, there were concerns about verifying the date of the video. SPD presented him with the overly broad warrant for the *entirety* of Mr. Ziegler's cell phone, not just the video. Notably, the Detectives advised Mr. Ziegler they were going to execute the search warrant (despite acknowledging the entirely exculpatory evidence) for the sole purpose of verifying the metadata of the video, *i.e.*, they needed to confirm the date and time the vide was taken. But they did not revise the search warrant or supporting affidavit to narrow the search and seizure for the limited purpose of obtaining the exculpatory video.

39. Even assuming *arguendo* the search warrant was lawful when it was signed by the judge, the facts on the ground so fundamentally changed and undermined the warrant that executing it constituted a due process violation.

40. Detectives Cox and Llovio and Sergeant Riffe then seized Mr. Ziegler's cell phone pursuant to the search warrant. At the time of the seizure, the Detectives advised Mr. Ziegler and Mr. Byrd that they were forced to download the entire contents of Mr. Ziegler's cell phone, including personal photos and videos and data completely unrelated to SPD's investigation. However, the Detectives stated that they would limit their search to the video and a specific message the accuser sent Mr. Ziegler. (The accuser texted Mr. Ziegler via Instagram's direct messenger feature about the video).

41. At the time of the seizure, Mr. Ziegler advised SPD that he had private communications with his wife on the phone. SPD responded by telling him they would only be looking for the video, communications with

the accuser and would otherwise be limited to the time of the alleged incident, etc.

42. SPD's download of Mr. Ziegler's cell phone took *five days* to complete. SPD downloaded Mr. Ziegler's entire internet search history, 30,417 videos, 473,199 photos, and roughly 1,200 text messages.

43. Despite stating they would limit their search to just the video and a specific message between Mr. Ziegler and his accuser, Detective Cox and Detective Llovio rummaged through all of the Electronically Stored Information (ESI) that was downloaded from Mr. Ziegler's cell phone. The Detectives' review of the downloaded material expanded to videos, photographs, and messages created years before the alleged conduct involving Mr. Ziegler's accuser. (It is not an exaggeration to say that the entirety of Mr. Ziegler's personal and public life was accessible to SPD after the download of his phone.) Detectives Llovio and Cox then flagged any pictures or videos they thought were relevant and put them in a separate folder to review. Detectives Cox and Llovio testified they flagged and

transferred completely *unrelated* personal pictures and texts that were created years before the date of the alleged incident.

44. Detectives Cox and Llovio would later state that SPD has no policy requiring a "taint team," or a group of individuals who are responsible for ensuring no confidential or sensitive information is reviewed by the SPD during the process of extracting ESI from a cell phone. All communications were accessed and reviewed by law enforcement – things entirely irrelevant to the investigation and privileged communications between Mr. Ziegler and his spouse and his attorney. The failure to have and use a taint team to prevent the disclosure and search of personal and privileged communications violates the Fourth Amendment. The City's policy of not using a taint team and its policy of having no protections is unlawful.

45. After reviewing the seized ESI, Detectives Cox and Llovio were unable to locate the exculpatory video. On November 13, 2023, Detective Cox and Llovio prepared a warrant directed to Google for Mr. Ziegler's Google Drive account with the intention of finding the exculpatory video. (It

appeared that the video was stored on a Google drive, not the phone itself, and that it was merely accessed via the cell phone). Detective Cox signed the supporting affidavit; Detective Llovio notarized it and was aware of the contents. Again, upon information and belief, Detective Llovio assisted Detective Cox with drafting the warrant. Despite Mr. Ziegler's prior offer to surrender the video, neither Detective Cox nor Detective Llovio contacted Mr. Ziegler for a copy of the video. Instead, the Detectives intentionally chose to continue their baseless and illegal search into Mr. Ziegler's personal life.

46. Like the warrant for Mr. Ziegler's cell phone, the Google warrant was overly broad. Despite only needing the warrant to locate a single video stored on Mr. Ziegler's Google Drive, the warrant sought:

1. Stored electronic communications or files associated with user accounts identified as Google User ID: [redacted]@gmail.com and any related accounts concerning the same account subscribers or users, since creation of such account until the date of production[;]
2. Records concerning the identity of the user of the above-listed user account(s); consisting of name, postal code, country, e-mail address, date of the account creation, IP address at account sign-up, logs showing IP address at

account sign-up, logs showing IP address, and date stamps for account accesses

3. Any photo prints linked to or associated with the above-listed user account(s). The photo prints are to include a compilation of all photos and or videos uploaded by the user that have not been deleted, along with all photos and videos uploaded by any user that has the user tagged in them
4. Any additional video and/or images uploaded or downloaded to the account with any associated metadata, timestamps, and IP addresses associated with the upload or download, as well as transactional logs that show user interaction with the videos/images
5. Stored Android backups,
6. Stored web bookmarks, web history, and autofill data that are stored under this account,
7. Files stored in the Google Drive related to this accident, to include shared folders that are accessible by this account,
8. Files stored in the Google Drive related to this account, to include shared folders that are accessible by this account with any associated metadata (EXIF), timestamps, IP addresses associated with the upload or download, any transactional logs that show user interaction with the videos/images;
9. Google Hangouts conversation content and history associated to this account,
10. Any additional Google Account or Google Play account, to include, account information, and account history,
11. Any location history including global positioning coordinates,
12. Google wallet/checkout service information, and
13. Installed application, device make(s), model(s) and international mobile identification number (IMEI) or

> mobile equipment identifier number (MEID) for Google account[.]

Again, the Google warrant did not include any sort of temporal limitation. Detectives were looking for a single video, but they obtained a warrant to search and to seize the entire Google drive account. *See* Exhibit B (Google drive warrant). Essentially, Detectives Cox and Llovio were seeking unfettered access to rummage through Mr. Ziegler's Google drive.

47. Like the affidavit supporting the search warrant for Mr. Ziegler's cell phone, the affidavit prepared by Detectives Cox and Llovio was deficient. Again, Detectives Cox and Llovio failed to mention the existence of the exculpatory video. The affidavit was grossly misleading, as the affidavit failed to mention that she, Detective Llovio, and Sergeant Riffe previously viewed the video and acknowledged its exculpatory nature. Moreover, the warrant failed to mention why it was necessary to obtain data and information dating back to years before the alleged crime was committed.

//

48. More specifically, paragraph 9 of the affidavit supporting the Google drive warrant states in full:

> On 11/02/23, Detectives interviewed Christian Ziegler with his attorney present. Christian advised he had consensual sex with the victim, and that he took a video of the encounter on 10/02/23 of the victim. Christian said he initially deleted the video, but since the allegation, he uploaded the video to his Google drive. Which [sic] we have not been able to locate upon a digital extraction.

*Id*. The Detectives lied by omission – they failed to advise the judge that they had reviewed the video and that the video was exculpatory. They also failed to advise the judge that Christian offered to voluntarily provide the video to the Detectives so they could verify the date and time it was recorded.

49. In response to the warrant, Google provided all the requested information. Despite having access to the entirety of Mr. Ziegler's Google Drive, Detectives Cox and Llovio were still unable to locate the exculpatory video.

50. After downloading and gaining access to Mr. Ziegler's entire life, SPD finally decided to take Mr. Ziegler up on his initial offer from November

2, and agreed to meet with him in person to extract the exculpatory video from his computer.

51. On December 1, 2023, Mr. Ziegler met with SPD at a parking lot and voluntarily provided them with his computer so that SPD could extract the exculpatory video. The SPD officers also took photographs of information from Mr. Ziegler's cell phone to compare with the metadata of the video.

52. Using the metadata from the extracted video, SPD confirmed that the video was taken the day of October 2, 2023, and ceased investigating Mr. Ziegler for assault. SPD could have done this on November 2, 2023, before and without violating Mr. Ziegler's constitutional rights, but SPD decided to go in a different direction.

53. It cannot be ignored that Detectives Cox and Llovio most likely violated multiple Florida statutes by abusing the warrant process and targeting Mr. Ziegler to satisfy their own personal biases. Specifically, Detectives Cox and Llovio likely violated section 933.16, Florida Statutes (criminalizing the act of maliciously procuring a search warrant to be issued

and executed) and section 933.17, Florida Statutes (criminalizing the act of exceeding authority granted by a search warrant).

54. Unfortunately, SPD was not done harassing Mr. Ziegler and his family. Upon completing its investigation into the allegations of assault, SPD began investigating Mr. Ziegler for video voyeurism under the theory that he recorded the accuser without her consent.

55. The accuser texted Christian, via Instagram's direct messaging feature, about the video. The Defendants were, apparently, looking for that single direct message.

56. In furtherance of its investigation into the video voyeurism charge, the SPD drafted a warrant directed to Meta/Instagram which sought:

> 1. Any and all stored electronic communications or files associated with the user accounts identified as User Accounts Identified by User ID(s):
>
>    [redacted]
>
>    Username: [redacted]
>
>    And any related accounts concerning the same account subscribers or users, since the creation of such account until the present time of this affidavit, including the content and header information of email messages and any attachments, user contact information, group contact information, IP logs, and instant messages (Instagram

Messenger) to include vanish mode messages, whether drafted, sent, received, opened or unopened, read or unread, and/or forwarded, and any buddy lists or contact lists, calendars, transactional data, account passwords or identifiers, and/or any other files related to those accounts.

2. Any Neoprints linked to or associated with the above Instagram user account. A Neoprint is an expanded view of a given user profile. It contains their current profile information, and all wall postings and messages to and from the user that have not been deleted by the user.
3. Any Photoprints or videos linked to or associated with the above Instagram user account. A Photoprint is a compilation of all photos uploaded by the user that have not been deleted, along with all photos uploaded by any user that has the user tagged in them.
4. Records concerning the identity of the user of the above-listed user account(s); consisting of name, postal code, country, e-mail address, date of account creation, IP address at account sign-up, logs showing IP address, and date stamps for account accesses.
5. Journal entries, Neoprints, comments, and the contents of private messages in the above-listed user's inbox, sent mail and trash folders related to the above-listed user account(s);
6. Any images, videos, or chats within the vanish mode setting of the above account.

*See* Exhibit C (Meta warrant). Again, the warrant did not contain any sort of temporal limitation. Nor was the warrant limited to communications

between Mr. Ziegler and Ms. Doe, which is theoretically all the police were searching for. Nor did it contain any limitation whatsoever.

57. Importantly, for the first time, SPD acknowledged that Detectives Cox and Llovio viewed the exculpatory video in Mr. Byrd's office on November 2. Equally notable, the Meta/Instagram warrant was not drafted, executed or notarized by Detective Cox or Detective Llovio, but rather other officers.

58. Paragraph 3 of the supporting affidavit states, in part: "This warrant, if granted, would enable the identification of possible suspect(s) to this crime." This is complete nonsense – the only potential suspect was Christian and the stated purpose of the warrant was to obtain the messages between the accuser and Christian *that would clear Christian of the video voyeurism accusation*. Paragraph 13 of the affidavit states "Byrd [Christian's attorney] made mention of a message (on Instagram vanish mode) between the victim and Zeigler where the victim asked him if he showed his wife the video."

59. Paragraph 17 of the supporting affidavit states in full: "Based on the above-mentioned facts, your Affiant believes that probable cause exists to show Instagram User chrismzieger [sic] has utilized Instagram to commit the crime of Video Voyeurism." This too is complete nonsense – there was never any suggestion that Christian *used* Instagram to commit any crime at all; there was an allegation that an exculpatory text exchange between the accuser and Christian might be in his direct messages on Instagram, but nothing more.

60. Meta/Instagram produced everything requested, but none of it was helpful to SPD's investigation.

61. On January 19, 2024, SPD referred to the State Attorney's Office a charge of video voyeurism. On March 6, 2024, the State Attorney's Office declined to formally charge Mr. Ziegler. SPD's investigation officially ended without any charges being brought against Mr. Ziegler. He was not charged or arrested.

62. Upon closing the investigation, the City had a constitutional obligation to immediately return ALL of the seized material without

maintaining a copy in any way. The City's failure to immediately do so is itself a violation of the Fourth and Fourteenth Amendments. The City is still in violation of the Fourth and Fourteenth Amendments because it still has not returned ALL of the seized material and is still maintaining a copy or copies. Florida's Public Records Act and other state laws are no exception or limitation on the City's Fourth and Fourteenth Amendments obligations and restrictions. Upon information and belief, the City has no policy or practice of returning seized documents past the point they constitutionally may possess them.

63. Upon information and belief, the City has no policies or training concerning how officers obtain search warrants. Alternatively, whatever polices and training the City has and provides is so utterly lacking that the City essentially permits officers to obtain blatantly unconstitutional search warrants.

64. Upon information and belief, the City did not discipline or reprimand or even retrain any officers as a result of the illegal search and

seizure. The City implicitly condoned and ratified the unlawful actions of Detectives Cox and Llovio.

65. Unfortunately, by that point, the damage had already been done to the Zieglers and their family. In January 2024, Mr. Ziegler was forced to step down from his position as Chair of the Florida Republican Party. Additionally, Mr. Ziegler lost a significant amount of work for his political consulting business. Mrs. Ziegler was forced to resign from her position at the Leadership Institute.

66. As part of SPD's investigation, Detectives Cox and Llovio prepared police reports which contained deeply confidential and personal information from Mr. Ziegler's cell phone that they never should have been able to access in the first place. The Defendants knew that they could not use communication between Mr. and Mrs. Ziegler against them, but they included them in the police reports anyway. It is as if the Defendants intentionally did an end-run around the Constitution and state law in an effort to embarrass and injury Mr. and Mrs. Ziegler. The release of these personal messages and information caused Mr. and Mrs. Ziegler to suffer

extreme embarrassment and mental anguish, as they were forced to watch as their personal business was posted in both local, state, and national newspapers and reported on by local, state, national, and international news stations.

67. Moreover, the Zieglers were forced to file a lawsuit against the City and the State Attorney in Sarasota County to protect their privacy and property rights and to stop the release of the documents and ESI unlawfully seized by the SPD. The lawsuit was successful, *see* Exhibit D ("Final Judgment") but is currently on appeal with Florida's Second District Court of Appeal. Among the findings by the trial court was the conclusion that the warrants were illegal. Neither the City nor the State Attorney appealed or contested that legal and factual conclusion.

68. The state court lawsuit has cost the Zieglers hundreds of thousands of dollars in attorney's fees.

69. Even though it has been almost two years since Mr. Ziegler was cleared of any alleged criminal activity, Mr. Ziegler's personal business continues to struggle and he has failed to achieve the same levels of business

he attained prior to the SPD's investigation. To this day, the Zieglers' reputation has not recovered.

70. A state trial court already ruled that the three search warrants violated Mr. Ziegler's Fourth Amendment and other constitutional rights despite the defendants in that action – which included the City of Sarasota – actively defending the constitutionality of the search warrants. *See* Exhibit D ("Final Judgment"). Neither the City of Sarasota nor the State Attorney's Office appealed that adverse ruling. Although there were intervening defendants in the state court action and those intervening defendants appealed the final judgment, they did not challenge the constitutionality of the search warrants on appeal. The Defendants here are collaterally estopped from relitigating the constitutionality of the search warrants in this Court.

//

//

**COUNT I: VIOLATION OF THE FOURTH AMENDMENT: EXECUTION OF ILLEGAL SEARCH WARRANTS**

(Christian Against the City of Sarasota)

71. Mr. Ziegler realleges and incorporates by reference paragraphs 1–70 as though fully set forth herein.

72. 42 U.S.C. § 1983 states that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory of the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

73. The cell phone search warrant was illegal. It was a broad, general warrant with no limitations whatsoever. The warrant even acknowledges it is supposed to be narrowly tailored and should be limited by subject-matter, but it is not tailored at all and is not limited by anything. The cell phone search warrant failed to acknowledge the existence of exculpatory evidence. The cell phone search warrant was executed only after the detectives viewed an exculpatory video and acknowledged the exculpatory nature of the video.

This was a material change in facts, yet the detectives did not go back to the judge or seek to modify the affidavit or the warrant.

74. The Google drive search warrant was illegal. It was a broad, general warrant. Theoretically, the warrant was to obtain the exculpatory video, but the warrant was not limited at all and the police seized the entirety of the Google drive. The Detectives also lied in the affidavit by failing to indicate they viewed the video and concluded it was exculpatory. Warrants are generally used for the purpose of finding evidence of a crime, not evidence of a not-crime.

75. The Meta/Instagram search warrant was illegal. The warrant was a broad, general warrant for the entirety of Christian's Instagram account even though police were only looking for direct messages between Christian and the accuser. It was not tailored in any way. Moreover, the warrant was supported by an affidavit filled with incorrect information, as it claimed Mr. Ziegler committed the crime of video voyeurism through Instagram.

76. As alleged herein, the City has an official custom and policy that requires the SPD to download the entirety of a cell phone seized pursuant to a search warrant. This policy grants SPD unfettered access to all private and confidential information stored on the cell phone, including private and confidential information that is entirely unrelated to the purpose of SPD's investigation. The City's policy of obtaining and executing only broad general warrants is a blatant Fourth Amendment violation. The City has a policy of taking no steps to limit the scope of a search warrant for a cell phone.

77. The City has a policy of seizing and searching an entire cell phone without due regard to the cell phone owner's right to maintain the confidentiality of attorney-client privileged or spousal privileged communications or medical records or pastoral communications. The City does not use a "taint team," or a group of individuals who are responsible for ensuring no confidential or sensitive information is reviewed by the SPD during the process of extracting ESI from a cell phone. The detectives who were involved in the investigation testified that they were not even aware of

what a taint team is or why it matters. Simply put, the City has a policy that every time it requests a search warrant for a cell phone, it always requests the entire contents of the phone without any particularized search. By default, the City is searching and seizing privileged communications it knows it cannot lawfully obtain or use.

78. Further, with respect to online accounts, like Mr. Ziegler's Google and Instagram Accounts, the City has a policy of only obtaining unlawful general warrants for the target's entire account. This is not constitutionally permissible and not required. All three of the search warrants executed by the SPD contained no language which would have limited its access to specific information and data located on Mr. Ziegler's cell phone or in his online accounts. Thus, pursuant to SPD's policy of only obtaining overly broad, general warrants, the SPD seized and gained access to Mr. Ziegler's personal information, including information entirely unrelated to its investigation.

79. Even if no approved "formal" written policy exists that requires SPD to obtain an unlawful general warrant in order to search and seize an

entire cell phone or online account, it is still considered customary for the SPD to do so. SPD's Digital Forensic Investigator Brian Yang testified that "[i]t is best practice to do a full file system or physical extraction if a forensic person has the capability of doing it." SPD's Sergeant Riffe also testified that it is the "best practice" to download the entirety of a seized cell phone. Detective Cox testified, "an entire mirror image of the phone has to be made. And it is not possible just to pull out certain parts of the phone during the extraction." Detective Llovio testified that it is "procedure" for SPD to seize an entire phone pursuant to a search warrant and that the program SPD uses requires SPD to extract an entire phone because "you can't tell it to leave certain things out." Mr. Yang and the Detectives make it clear that SPD downloads the entirety of a seized cell phone *every time* it seizes one.

80. Because of the City's policies and customs relating to the search procedures for seized cell phones and search procedures for online accounts, specifically the City's policy and custom requiring a full download of a seized cell phone or complete search of an online account, SPD officers were forced to obtain an overly broad search warrant directed towards the

entirety of Mr. Ziegler's cell phone, Google Account, and Instagram Account.

81. Essentially, the City has failed to train SPD officers on proper Fourth Amendment procedure in obtaining and executing search warrants by failing to require the use of more narrowly tailored search warrants with regard to accessing cell phones and social media accounts. The City's failure to adequately train SPD officers on legal search warrant procedure in compliance with the Fourth Amendment demonstrates a deliberate indifference to Mr. Ziegler's Fourth Amendment rights.

82. Pursuant to that overly broad search warrant, SPD Detectives gained access to hundreds of thousand deeply personal and confidential pictures, videos, and text messages belonging to Mr. Ziegler, most of which were unrelated to its investigation. Messages seized by the SPD included marital communications sent between the Zieglers.

83. Moreover, SPD would not have been able to gain access to the deeply personal and confidential information if they had employed the use of a taint team.

84. The City's policies and customs violated Mr. Ziegler's Fourth Amendment rights. Based on the testimony of Detectives Riffe, Llovio and Cox, and Forensic Specialist Yang, this is no mere anomaly – but standard practice by SPD.

85. Mr. Ziegler suffered injuries, damages, and losses proximately caused by the policies and practices of the City as alleged herein.

86. As a legal and proximate result of the policies and practices of the City as alleged herein, Mr. Ziegler has sustained general damages consisting of pain, suffering, anxiety, and other physical and emotional damages in such sums as shall be determined.

87. As a further legal and proximate result of the policies and practices of the City as alleged herein, Mr. Ziegler has sustained economic damages consisting of loss of past and future earnings, and other career development opportunities, in such nature and sums as shall be determined.

88. Pursuant to 42 U.S.C. § 1988, and other applicable law, Mr. Ziegler is entitled to an award of costs and expenses incurred in bringing this action, including his reasonable attorney's fees.

89. In addition to seeking compensatory damages, Mr. Ziegler is also seeking injunctive relief to order the City to return all searched and seized materials and to otherwise require the City to permanently destroy and not maintain any copies of the searched and seized materials. (The seized material is currently the subject of a destruction order, but that order is on appeal. If that order is reversed in whole or in part, Mr. Ziegler will seek injunctive relief here on an emergency basis.).

//

**COUNT II: VIOLATION OF THE FOURTH & FOURTEENTH AMENDMENTS: WRONGFUL RETENTION**

(Christian Against the City of Sarasota)

90. Mr. Ziegler realleges and incorporates by reference paragraphs 1–70 as though fully set forth herein.

91. 42 U.S.C. § 1983 states that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory of the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

92. The City has a constitutional obligation to return and to otherwise not maintain anything that was searched and seized.

93. Once the investigation ends without any prosecution, which in this case occurred at the latest on March 6, 2023, the City immediately loses all Constitutional authority to possess Christian Ziegler's private property.

94. The contents of the cell phone, Google drive and Instagram account is Christian's personal property, and the search warrants never convert his personal property into the people's property.

95. The City has failed to return the seized material it obtained as a result of the three search warrants. The City had a constitutional obligation to immediately return the material once the investigation concluded. It still has not done so. The City has no policies or procedures in place to return seized material. In fact, it appears that the City policy is to not return the seized material unless court ordered. The failure to return the seized material is itself an independent Fourth and Fourteenth Amendment violation.

96. Upon information and belief, the City's only basis to not comply with its constitutional obligations is the City's apparent belief that it has to preserve the seized material to comply with the Florida Public Records Act. This is a mistaken legal belief without any legal authority.

97. The unlawful retention of seized property is itself a distinct and ongoing violation of Christian's Fourth and Fourteenth Amendment rights.

98. Plaintiff seeks damages for wrongful retention and seeks injunctive relief requiring the City to return or otherwise destroy the seized property and all copies of it.

**COUNT III: VIOLATION OF THE FIFTH AMENDMENT**
(Christian Against the City of Sarasota)

99. Mr. Ziegler realleges and incorporates by reference paragraphs 1–70 as though fully set forth herein.

100. This is a taking claim pursuant to the Fifth Amendment.

101. The Fifth Amendment provides a direct cause of action for unconstitutional takings done without just compensation to the victim. *Fulton v. Fulton Cnty. Bd. of Comm'rs*, 148 F.4th 1224, 1255 (11th Cir. 2025) ("The Framers of the Fourteenth Amendment then ensured a federal

guarantee of the 'just compensation' remedy against state and local governments. This history supports the conclusion that a federal cause of action for damages exists directly under the Takings Clause.").

102. The data and information seized from Mr. Ziegler's cell phone, and Google and Instagram accounts is his private, personal property.

103. Through the use of three unlawful search warrants, the City of Sarasota wrongfully obtained Mr. Ziegler's private property and it is, potentially, turning into public property under the guise of Florida's Public Records Act.

104. There is no lawful basis for a municipality to obtain private property via an unlawful search warrant and convert it to public property.

105. The search warrants were unlawful, but the unlawful nature of the search warrant is not dispositive.

106. The Fifth Amendment prohibits the taking of private property for public use without just compensation.

107. The contents of the cell phone, Google drive and Instagram account constitute private property within the meaning of the Fifth Amendment.

108. The City has not provided Christian with just compensation.

109. The City owes Christian damages.

110. In addition to damages, Christian seeks an injunction to further prevent the unlawful taking.

**COUNT IV: VIOLATION OF THE FOURTH AMENDMENT**
(Christian Against Detective Cox)

111. Mr. Ziegler realleges and incorporates by reference Paragraphs 1–70 as though fully set forth herein.

112. Detective Cox knew that the affidavit for the search warrant for Mr. Ziegler's cell phone contained false and misleading information at the time the affidavit was submitted to Judge Krug. While preparing the cell phone affidavit, Detective Cox intentionally misled the judge by omitting any reference to an exculpatory video located on Mr. Ziegler's cell phone. She knew this information was material, but omitted it from the affidavit. Before executing the search warrant, Detective Cox obtained information

that she acknowledged materially undermined the affidavit and the warrant. She did not advise the judge who signed off on the warrant and she instead executed the warrant knowing she lost whatever probable cause she once had.

113. Detective Cox knew that the affidavit for the search warrant for Mr. Ziegler's Google drive contained false and misleading information at the time the affidavit was submitted to Judge Krug. While preparing the affidavit supporting the Google drive warrant, Detective Cox intentionally misled the judge by omitting any reference to the exculpatory video located on Mr. Ziegler's cell phone. She knew this information was material but still omitted it from the affidavit. Moreover, the warrant was grossly overbroad, as it failed to explain why SPD needed the entirety of Mr. Ziegler's Google Drive, including data from several years prior to the investigation. The Google drive warrant was obtained to seize a single video, but it was not tailored accordingly.

114. Detective Cox intended Judge Krug to rely on the false and misleading information in the affidavit for the cell phone search warrant.

115. Detective Cox intended to make Judge Krug rely on the false and misleading information in the affidavit for the Google search warrant.

116. Detective Cox knew that the search warrant for Mr. Ziegler's cell phone she prepared was based on false and misleading information in the Affidavit and was overbroad on its face.

117. Detective Cox knew that the search warrant for Mr. Ziegler's Google drive was based on false and misleading information in the Affidavit and was overbroad on its face.

118. The affidavit supporting the search warrant for Mr. Ziegler's cell phone and the warrant itself are overbroad on their face and cannot serve as the basis for a lawful search or seizure of Mr. Ziegler's cell phone.

119. The affidavit supporting the search warrant for Mr. Ziegler's Google drive account and the warrant itself are overbroad on their face and cannot serve as the basis for a lawful search or seizure of Mr. Ziegler's Google Drive account.

120. Detective Cox improperly used both illegal search warrants as justification to search and gain access to Mr. Ziegler's private and personal ESI.

121. Detective Cox's actions violated Mr. Ziegler's clearly establish Fourth Amendment right to be free from illegal searches and seizures.

122. Detective Cox executed the cell phone warrants despite a material change in circumstances that entirely undermined the warrant and supporting affidavit – to wit, her review of an entirely exculpatory video.

123. Moreover, Detective Cox knowingly obtained two unlawful general warrants which failed to contain safeguards which limited what data SPD could access during their search of the cell phone. Through these unlawful warrants, Detective Cox was able to gain access to information and data that were not identified in the warrants signed by Judge Krug.

124. Upon information and belief, Detective Cox was motivated by actual malice toward the Zieglers.

125. Detective Cox's bias and motive is demonstrated by the fact that the Meta warrant, which Detective Cox apparently did not prepare, mentions the existence of the exculpatory video.

126. Detective Cox's omission of material information, such as Sergeant Rife's conversation with Mr. Byrd, the existence of an exonerating video, and Detectives Cox and Llovio's plan to view the exonerating video, was done intentionally or with a reckless disregard for the accuracy of the affidavit.

127. Information regarding the existence of a video of Mr. Ziegler's encounter with Ms. Doe was material because the video was the only piece of evidence at the time that connected Mr. Ziegler's cell phone to the alleged assault. Thus, details about the existence of the video were necessary to establish probable cause.

128. As a direct and proximate cause of Detective Cox's actions in violation of the Fourth Amendment, Mr. Ziegler has suffered both economic and non-economic damages.

129. Pursuant to 42 U.S.C. § 1988, and other applicable law, Mr. Ziegler is entitled to an award of costs and expenses incurred in bringing this action, including his reasonable attorney's fees.

130. To the extent Detective Cox remains in possession of seized material, an injunction should be issued requiring the seized material to be returned to Mr. Ziegler without her keeping a copy.

**COUNT V: VIOLATION OF THE FOURTH AMENDMENT**
(Christian Against Detective Llovio)

131. Mr. Ziegler realleges and incorporates by reference Paragraphs 1–70 as though fully set forth herein.

132. Detective Llovio knew that the affidavit for the search warrant for Mr. Ziegler's cell phone contained false and misleading information at the time the affidavit was submitted to Judge Krug. While preparing the cell phone affidavit, Detective Llovio intentionally decided to mislead the judge by omitting any reference to an exculpatory video located on Mr. Ziegler's cell phone She knew this information was material but omitted it from the affidavit. Before executing the search warrant, Detective Llovio obtained information that she acknowledged materially undermined the supporting

affidavit and the warrant. She did not advise the judge who signed off on the warrant. Whatever probable cause existed when the warrant was obtained was lost prior to execution. This did not stop Llovio.

133. Detective Llovio knew that the affidavit for the search warrant for Mr. Ziegler's Google drive account contained false and misleading information at the time the affidavit was submitted to Judge Krug. While preparing the affidavit supporting the Google drive warrant, Detective Llovio intentionally misled the judge by omitting any reference to an exculpatory video located on Mr. Ziegler's cell phone. She knew this information was material but still omitted it from the affidavit. Moreover, the warrant was grossly overbroad, as it failed to explain why SPD needed the entirety of Mr. Ziegler's Google drive, including data from several years prior. The Google drive warrant was obtained to seize a single video, but the warrant was not limited accordingly.

134. Detective Llovio intended Judge Krug to rely on false and misleading information in the affidavit for the cell phone search warrant.

135. Detective Llovio intended Judge Krug to rely on false and misleading information in the affidavit for the Google search warrant.

136. Detective Llovio knew that the search warrant for Mr. Ziegler's cell phone she prepared was based on false and misleading information in the affidavit and was overbroad on its face.

137. Detective Llovio knew that the search warrant for Mr. Ziegler's Google drive was based on false and misleading information in the affidavit and was overbroad on its face.

138. The affidavit supporting the search warrant for Mr. Ziegler's cell phone and the warrant itself are overbroad on their face and cannot serve as the basis for a lawful search or seizure of Mr. Ziegler's cell phone.

139. The affidavit supporting the search warrant for Mr. Ziegler's Google drive account and the warrant itself are overbroad on their face and cannot serve as the basis for a lawful search or seizure of Mr. Ziegler's Google drive account.

140. Detective Llovio improperly used both illegal search warrants as justification to search Mr. Ziegler's private and personal ESI.

141. Detective Llovio's actions violated Mr. Ziegler's clearly established Fourth Amendment right to be free from illegal searches and seizures.

142. Detective Llovio executed the cell phone warrants despite a material change in circumstances that entirely undermined the warrant and supporting affidavit – to wit, her review of an entirely exculpatory video.

143. Moreover, Detective Llovio knowingly obtained two unlawful general warrants which failed to contain safeguards which limited what data SPD could access during their search of the cell phone. Through these unlawful warrants, Detective Llovio was able to gain access to information and data that were not identified in the warrants signed by Judge Krug.

144. Detective Llovio was motivated by actual malice toward the Zieglers.

145. Detective Llovio's bias and motive is demonstrated by the fact that the Meta warrant, which Detective Llovio apparently did not prepare, mentions the existence of the exculpatory video.

146. Detective Llovio's omission of important information from all three warrants, such as Sergeant Rife's conversation with Mr. Byrd, the existence of an exonerating video, and Detectives Cox and Llovio's plan to view the exonerating video, was done intentionally or with a reckless disregard for the accuracy of the affidavit.

147. Information regarding the existence of a video of Mr. Ziegler's encounter with Ms. Doe was material because the video was the only piece of evidence at the time that connected Mr. Ziegler's cell phone to the alleged assault. Thus, details about the existence of the video were necessary to establish probable cause.

148. As a direct and proximate cause of Detective Llovio's actions in violation of the Fourth Amendment, Mr. Ziegler has suffered both economic and non-economic damages.

149. Pursuant to 42 U.S.C. § 1988, and other applicable law, Mr. Ziegler is entitled to an award of costs and expenses incurred in bringing this action, including reasonable attorney fees. To the extent Detective Cox remains in possession of seized material, an injunction should be issued

requiring the seized material to be returned to Mr. Ziegler without her keeping a copy.

**<u>COUNT VI: 42 U.S.C. § 1983</u>**

(Christian Against the State Attorney pursuant to *Ex Parte Young*)

150. Mr. Ziegler realleges and incorporates by reference Paragraphs 1–70 as though fully set forth herein.

151. The State Attorney is immune from damages under 42 U.S.C. § 1983. The State Attorney, however, can be sued in his official capacity under 42 U.S.C. § 1983 for prospective injunctive relief pursuant to *Ex Parte Young*.

152. The City obtained Mr. Ziegler's private property via three patently unconstitutional search warrants.

153. A very small subset of the seized materials was transmitted to the State Attorney.

154. The State Attorney is currently in possession of the small subset of seized materials.

155. The State Attorney declined to prosecute Mr. Ziegler and closed the investigation with any charges or arrest.

156. Upon closing the investigation, the State Attorney lost any right to possess any of Mr. Zeigler's private property that was seized pursuant to the three search warrants.

157. The State Attorney's continued possession of the seized property violates Mr. Ziegler's Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution, *i.e.*, this is ongoing violation.

158. The State Attorney is the recipient of multiple public records requests under Florida's Public Records Act seeking the seized material.

159. The State Attorney is currently enjoined by a state circuit court order from producing the seized material in response to the public records requests. The State Attorney is further required to return to Mr. Ziegler and to otherwise permanently destroy all copies of the seized material.

160. The State Attorney has not complied with the state court injunction order. The destruction order is stayed pending appellate review.

161. The State Attorney is not enjoined from destroying or returning the seized material. It should have done so immediately upon closing the

investigation nearly two years ago. For unknown reasons, it has chosen not to do so.

162. If the State Attorney were to produce the seized material pursuant to the state Public Records Act, the State Attorney would be violating Mr. Ziegler's constitutional rights. Mr. Ziegler's constitutional rights trump and preempt the state Public Records Act.

163. The state Public Records Act, if applied to the seized material, would violate Mr. Ziegler's federal constitutional rights. The fact that the three search warrants were unlawful is not dispositive, but makes the State Attorney's potential violation of Mr. Ziegler's constitutional rights even more egregious.

164. The state Public Records Act, as applied to seized material where the target was not prosecuted, is unconstitutional.

165. Mr. Ziegler seeks a permanent injunction precluding the State Attorney from continuing to possess any material obtained via the three search warrants and from disclosing any material obtained via the three search warrants in response to any public records request under state law.

166. Mr. Ziegler should be awarded his attorneys fees against the State Attorney.

**COUNT VII: 42 U.S.C. § 1983**
(Bridget Against the City of Sarasota)

167. Mrs. Ziegler realleges and incorporates by reference Paragraphs 1–70 as though fully set forth herein.

168. 42 U.S.C. § 1983 provides a cause of action against any person who, under color of state law, deprives another of rights secured by the Constitution.

169. Mrs. Ziegler's claim arises from the City's post-seizure conduct, including the review, retention, use, and dissemination of her deeply private personal information, in violation of the Fourteenth Amendment.

170. The City intentionally reviewed, retained, preserved, and catalogued intimate marital communications, photographs, videos, and messages involving Bridget Ziegler that were unrelated to any legitimate law enforcement purpose and had no evidentiary value.

171. At the time the City reviewed and retained this material, they knew that Bridget Ziegler was not suspected of any crime and that the materials were unrelated to the investigation of Christian Ziegler.

172. The City further included this intimate personal information in police reports and investigative files and caused or permitted its disclosure to third parties, including members of the media, resulting in public dissemination, stigma, and severe reputational harm to Bridget Ziegler.

173. The City's conduct was arbitrary, conscience-shocking, and lacked any legitimate governmental purpose, constituting an abuse of investigative authority in violation of Bridget Ziegler's substantive due process and informational privacy rights under the Fourteenth Amendment.

174. These constitutional violations were caused by the City of Sarasota's customs, policies, and practices, including its failure to implement safeguards to prevent the review, retention, and dissemination of non-suspect private information, rendering the City liable under *Monell*.

175. As a direct and proximate result of the City's unconstitutional conduct, Bridget Ziegler suffered significant emotional distress, reputational

harm, loss of employment and professional opportunities, and other damages.

176. Plaintiff Bridget Ziegler seeks compensatory damages, declaratory relief, injunctive relief requiring the return and destruction of all retained copies of her private information, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

## JURY TRIAL DEMAND

177. Mr. and Mrs. Ziegler demand a jury trial on all counts so triable.

//

//

//

**PRAYER FOR RELIEF**

Mr. Ziegler prays this Court:

i. Enters judgment in his favor and against Defendants the City of Sarasota, Angela Cox, Maria Llovio and the State Attorney;

ii. Awards compensatory damages including, but not limited to, attorney fees incurred for suing to prevent the release of improperly seized personal property, against Defendants City of Sarasota, Cox and Llovio (*i.e.*, all of the fees and costs incurred in the state court action);

iii. Awards economic damage from Defendants City of Sarasota, Cox and Llovio for lost income and non-economic damages for Mr. Ziegler's mental anguish, pain and suffering, and humiliation and embarrassment and reputational harm;

iv. Awards punitive damages against Defendants Cox and Llovio;

v. Awards Mr. Ziegler his reasonable attorney's fees pursuant to 42 U.S.C. § 1988 against all Defendants;

vi. Awards permanent injunctive relief against all Defendants preventing them from possessing and/or distributing the seized material.

vii. Awards taxable costs against all Defendants; and

viii. Awards any further relief the Court deems necessary and appropriate.

Mrs. Ziegler prays this Court:

(i) enters judgment in her favor and against the City of Sarasota;

(ii) awards her monetary damages;

(iii) awards her attorneys fees and taxable costs; and

(iv) any other relief the Court deems necessary and appropriate.

Respectfully submitted,

Matthew Seth Sarelson
Florida Bar 888281
Zachary Stoner
Florida Bar 1032816
**DHILLON LAW GROUP INC.**
Attorneys for Plaintiffs
1601 Forum Place, Suite 202
West Palm Beach, Florida 33401
305.391.2111
msarelson@dhillonlaw.com
zstoner@dhillonlaw.com